# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

BECKY BOSTICK,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:16-cv-849

Black, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Becky Bostick, brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security (Commissioner) denying

plaintiff's application for disability insurance benefits ("DIB"). This matter is before the Court

on plaintiff's Statement of Errors (Doc. 11), and the Commissioner's response in opposition

(Doc. 16).

## I. Procedural Background

Plaintiff filed her application for DIB in January 2013, alleging disability since December

13, 2012, due to a history of parietal intracerebral hemorrhage; right shoulder degenerative joint

disease; obesity; fibromyalgia; adjustment disorder with mixed anxiety and depressed mood;

depressive disorder NOS; and panic disorder with agoraphobia. The application was denied

initially and upon reconsideration. Plaintiff, through counsel, requested and was granted a *de*

*novo* hearing before administrative law judge ("ALJ") Mary F. Withum. Plaintiff and a

vocational expert ("VE") appeared and testified at the ALJ hearing on March 31, 2015. On April

22, 2015, the ALJ issued a decision denying plaintiff's DIB application. Plaintiff's request for

review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§

404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2017.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since December 13, 2012, the alleged onset date (20 CFR 404.1571, *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: adjustment disorder, depressive disorder, anxiety disorder, obesity, fibromyalgia, history of intracerebral hemorrhage with left upper extremity weakness, and right shoulder degenerative joint disease (20 CFR 404.1520(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5. After careful consideration of the entire record, [the ALJ] find[s] that the [plaintiff] had the residual functional capacity [("RFC")] to perform light work as defined in 20 CFR 404.1567(b) with additional limitations meaning she can only stand and/or walk approximately 4 hours out of an 8 hour workday, occasionally climb ramps or stairs, stoop, crouch, kneel, and crawl. She is limited to occasional bilateral overhead reaching and occasional handling and fingering with her left non-dominant hand. She is limited to simple, routine, and repetitive tasks.

6. The [plaintiff] is unable to perform her past relevant work as an administrative assistant or as a buyer (20 CFR 404.1565).

7. The [plaintiff] was born [in] . . . 1973 and was 39 years old, which is defined as a younger individual age 18-49, on alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[1]

11. The [plaintiff] was not under a disability, as defined in the Social Security Act, from December 13, 2012, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-27).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

---

[1] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light occupations such as router, with 76,000 jobs nationally, and mail clerk, with 51,200 jobs nationally. (Tr. 26, 62).

402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229

(1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a

preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination. Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving

weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical evidence

### 1. Physical impairments

Plaintiff was hospitalized from December 13, 2012 to December 16, 2012 after

presenting with seizures, migraines and a right shoulder dislocation. (Tr. 308-352). An MRI of

the brain dated December 14, 2012 showed multi focal subtle FLAIR (fluid attenuated inversion

recovery) sulcal hyperintensity and minimal leptomeningeal enhancement, suggestive of

meningitis. (Tr. 326-327). It was noted a subtle subarachnoid hemorrhage could result in the

FLAIR signal alteration but was considered less likely. (Tr. 327). Plaintiff was again

hospitalized from December 17, 2012 to December 20, 2012 after presenting with worsening

headache and paresthesias and numbness on the left side of her face and arm. (Tr. 283-307). A CT of the head dated December 20, 2012 showed a right hemispheric bleed over the vertex. (Tr. 291-292). She was transferred to Miami Valley Hospital for evaluation by a neurosurgeon. (Tr. 285). She was hospitalized from December 20, 2012 to December 27, 2012 for evaluation and treatment of right parietal cortical hemorrhage (bleeding inside the parietal portion of the brain). (Tr. 414-486).

A CT of the head dated January 22, 2013 showed focal area of apparent encephalomalacia (softening or loss of brain tissue) in the region of the previous intracranial hemorrhage. (Tr. 546).

On January 23, 2013, plaintiff was examined by Douglas Gula, D.O., for an evaluation of bilateral shoulder pain. (Tr. 511-515). Examination of the left shoulder showed tenderness about the anterior aspect of the shoulder-biceps area. (Tr. 512-513). Examination of the right shoulder showed tenderness in the AC joint and acromion. (Tr. 513). There was decreased range of motion and decreased strength of the right upper extremity. (*Id.*). Dr. Gula indicated there was marked limitation of motion of the right shoulder. (*Id.*). Dr. Gula diagnosed closed dislocation of the right shoulder, left anterior shoulder pain, and right biceps tendinitis. (*Id.*).

An MRI of the right shoulder dated January 25, 2013 showed chronic appearing sequela of posterior dislocation of the right shoulder with large reverse Hill-Sachs impaction fracture and nonunited [] 2.3 cm fracture fragment from the anterior humeral head lying in the anterior jointline, with persistent posterior dislocation of the humeral head relative to the glenoid; small glenohumeral joint effusion with fluid and edema extending into the anterior soft tissues

suggestive of anterior capsular tear; and mild supraspinatus tendinopathy without focal rotator cuff tear. (Tr. 525-26). Plaintiff had surgery on her right shoulder in May 2013. (Tr. 609-610).

A cerebral angiogram dated June 6, 2013 was normal. (Tr. 928-929). There was resolution of vasculopathic changes when compared with the study from December 2012. (Tr. 929).

Dr. Gary Ray, M.D., examined plaintiff for disability purposes on June 17, 2013. At the time of this evaluation, plaintiff was one month post right shoulder surgery due to dislocation following her seizure. (Tr. 565). Plaintiff reported currently getting headaches especially when under stress and mild weakness of the left upper and lower extremities. (*Id.*). Plaintiff reported that at times her left upper extremities shake and her left leg jerks. Plaintiff reported having severe memory processing problems and was tearful describing this to Dr. Ray. (*Id.*). Dr. Ray noted that plaintiff needed assistance bathing, dressing and using the toilet. (Tr. 566). Plaintiff was unable to lift and carry anything with her right upper extremity given it was in a sling, and she could only lift one to two pounds with her left hand. Plaintiff was able to sit without difficulty. She was able to stand for ten minutes at one time and she could walk for ten to fifteen minutes. Plaintiff had trouble bending, stooping, squatting, and ascending and descending stairs. Plaintiff reported being able to go to the store for short periods of time. She had difficulty holding a cup, opening jars, writing, buttoning, zipping, opening doors, and using a key. (*Id.*).

On examination, Dr. Ray reported plaintiff was slow with going from a sitting to a standing position; she was slow and needed assistance getting on and off the examination table; she was able to reach 50% of a squat position; and she was unable to remember any object out of three after five minutes. (*Id.*). Dr. Ray noted she had a mild tremor in the left upper extremity.

7

(*Id.*). She had 4+/5 strength in her left upper and lower extremities. Right upper extremity testing was not performed due to plaintiff's recent surgery. Plaintiff exhibited full right lower extremity strength. Deep tendon reflexes were 0 at the left biceps and triceps, and 1 at the knees and ankles. There was decreased sensation to touch in the left upper extremity and a decrease in manipulation and gripping with the left hand. Plaintiff had abnormal grasp, manipulation, pinch, and fine coordination on the left. After reviewing her medical records and examining plaintiff, Dr. Ray opined that plaintiff was unable to lift with her right hand due to her recent shoulder surgery and could lift up to two pounds with her left hand. Dr. Ray also opined that plaintiff would have difficulty with fine motor activities and repetitive forceful gripping activities with her left hand; she had no limitation sitting; she could stand for up to 30 minutes at a time; she could walk for up to ten minutes at a time; and she should avoid any balance activities, bending, stooping, squatting, kneeling, crawling, and climbing. (Tr. 567).

X-rays of the right shoulder dated August 12, 2013 showed new concavity along the articular surface of the humeral head compared to the previous study, likely related to a known osteochondral defect. (Tr. 623-624).

Plaintiff was hospitalized from August 31, 2013 to September 1, 2013 after presenting with shortness of breath and difficulty breathing. (Tr. 631-658). The attending cardiologist diagnosed asymptomatic sinus tachycardia and advised a trial of Xanax 0.5 mg, indicating her symptoms may be secondary to underlying anxiety. (Tr. 641).

Plaintiff was again hospitalized from September 5, 2013 to September 10, 2013 after presenting with heart palpitations and dizziness. (Tr. 710-763). She was seen in the emergency room and discharged home, but returned later the same day and was admitted for further testing.

(Tr. 724-730). A cardiologist believed her chest pain was caused by Metoprolol and discontinued this medication. (Tr. 744). Plaintiff's heart rate dropped to 80-90 after she was started on Verapamil, Toprol and Xanax. (Tr. 745).

On January 27, 2014, plaintiff saw Keith Kenter, M.D., for a postoperative evaluation of her right shoulder. (Tr. 1122-1123). On physical exam, supraspinatus strength was 4/5. (Tr. 1123). There was a positive impingement sign. (*Id*). Dr. Kenter stated he was delighted with the appearance of plaintiff's right shoulder and believed most of her pain was due to the deconditioned rotator cuff. (*Id*.).

On April 10, 2014, plaintiff established care with rheumatologist Hana Badreddine, M.D. (Tr. 1175-1177). Plaintiff reported having constant muscle pain and fatigue. (Tr. 1175). She said her sleep was quite disturbed and she had morning stiffness lasting one hour, sometimes more. (*Id*.). Exam showed plaintiff was 5'4" tall and weighed 208 pounds. (Tr. 1176). The fibromyalgia tender points were all positive. (*Id*.). Dr. Badreddine ordered lab work and said if it was negative she would treat plaintiff for fibromyalgia. (Tr. 1177).

In an office note dated May 16, 2014, Jacob Kitchener, M.D., stated plaintiff was cleared from a neurological standpoint to resume all activities without restriction. (Tr. 1130-1132).

In an office note dated June 19, 2014, Dr. Badreddine reported all tender points for fibromyalgia were present. (Tr. 1172). Range of motion of the right shoulder was limited. (*Id*.). Neck range of motion elicited pain. (*Id*.). Dr. Badreddine noted plaintiff's lab work was negative and she assessed fibromyalgia and fatigue, significant in nature, and increased plaintiff's dosage of Cymbalta to 60 mg daily for treatment of fibromyalgia. (*Id*)

In an office note dated October 16, 2014, plaintiff complained of more aches, pains, and stiffness, as well as fatigue and depression. Dr. Badreddine reported that "all the tender points for fibromyalgia were positive and present and also present was some pain on range of motion of the neck" and there was "[n]o swelling in any of the joints." (Tr. 1170). Plaintiff asked to be taken off the medication Cymbalta because it caused palpitation, constipation, and migraine headaches. (Tr. 1170).

On March 5, 2014, plaintiff transferred her primary care to Anubhav Mital, M.D. (Tr. 1269). Dr. Mital assessed upper respiratory infection, shortness of breath, myalgias, a history of CVA, a history of seizures, hypertension, GERD, anxiety and depression (for which plaintiff was seeing a psychiatrist), tachycardia, obesity, and joint pain. A spirometry test showed moderate restriction. (Tr. 1271). On April 17, 2014, plaintiff was seen for a follow-up on blood work and medication refills. (Tr. 1277). Plaintiff saw Dr. Mital for a refill on her medications on February 12, 2015. (Tr. 1281). Plaintiff reported she was suffering from increased fibromyalgia symptoms and was recently seen by rheumatology. (Id.). On March 3, 2015, plaintiff was seen for a follow-up on blood work and medication refills. (Tr. 1291).

On March 27, 2015, Dr. Mital completed a RFC questionnaire on plaintiff's behalf in which he opined that plaintiff was incapable of even low stress work. (Tr. 1306). Dr. Mital also opined that during an 8-hour workday, plaintiff could sit for 30 minutes at a time and less than two hours total, stand/walk for ten minutes at a time and less than two hours total, rarely lift up to ten pounds, and never lift ten pounds or more. (Tr. 1306-07). According to Dr. Mital, plaintiff needed a job that permitted shifting positions at will, and she would need to walk around for six minutes every 30 minutes. (Tr. 1307). He further opined that plaintiff could rarely

perform movements with her head and neck and could never twist, stoop, crouch, climb ladders, or climb stairs. (Tr. 1307-08). He noted that plaintiff had significant limitations with reaching, handling, or fingering, but Dr. Mital did not specify the percentages of time during an eight-hour work day that plaintiff could use her hands, fingers, or arms because "PT [patient] unable to answer." (Tr. 1308). Dr. Mital also noted that plaintiff would be absent from work more than four days per month. (*Id*.).

### 2. Mental health impairments

Dr. James Rosenthal Psy. D., evaluated plaintiff for disability purposes on June 29, 2013. (Tr. 573-78). Plaintiff was driven to the appointment by her husband. She was casually dressed; alert and oriented; and made good eye contact. She was polite, cooperative, and pleasant. Plaintiff was tearful a couple of times during the interview. Dr. Rosenthal found her speech was normal rate and volume and her affect was pleasant. Plaintiff stated that she felt grumpy most days. Plaintiff reported low energy levels and gaining 40 pounds since December 2012. Plaintiff reported crying spells and feeling somewhat worthless and useless. Dr. Rosenthal noted no symptoms of mania. Plaintiff denied having any phobias, obsessions, or compulsions. Plaintiff denied hallucinations or delusions. Her general knowledge was adequate, as was insight and judgment. Dr. Rosenthal diagnosed plaintiff with an adjustment disorder with mixed anxious and depressed mood and assigned her a GAF score of 55. Dr. Rosenthal concluded that plaintiff would have difficulty completing complex or multi-step tasks without prompts from bosses or co-workers; she would be able to understand and remember directions on a simple or one-step work task; and she could sustain concentration on a simple or repetitive task once it was learned, but her work pace would remain slow. (Tr. 578).

On September 23, 2013, plaintiff saw Randee Poeppelman, LISW, for an evaluation of anxiety. (Tr. 703-705). She noted a rule out diagnosis of PTSD due to plaintiff's dealing with her stroke and brain bleed. (Tr. 703). On mental status exam, Ms. Poeppelman reported plaintiff's behavior was agitated and psychomotor behaviors were hyperactive; speech was pressured; affect was flat; mood was anxious and depressed; self-perception was abasing; and thought processes were blocked. (Tr. 703-704). Plaintiff was assessed with anxiety with a GAF of 55.

Plaintiff was hospitalized from September 24, 2013 to September 25, 2013 due to tachycardia and panic attack. (Tr. 764-774).

On October 9, 2013, plaintiff was seen for an initial diagnostic assessment at Access Counseling. (Tr. 951-972). Plaintiff reported that her current problems stemmed from seizures and a "brain bleed" (cerebrovascular accident (CVA)), which occurred in mid-December 2012. (Tr. 965). She reported that she also suffered a broken shoulder during the seizure, which was surgically repaired months later. (*Id.*). Plaintiff reported that she used to have a demanding job, was outgoing, and financially secure but due to her medical issues she did not want to leave the house or her husband. She had "rapid thoughts" and cried daily. (*Id.*). She blamed herself for her issues and suffered from panic attacks. She had no previous history of mental health issues prior to her seizures. On mental status exam, plaintiff's activity was noted to be slowed; her demeanor was withdrawn; her mood was depressed and anxious; and her behavior was withdrawn and notable for anhedonia. (Tr. 970-71). She was initially assessed with adjustment disorder with mixed anxiety and depressed mood. (Tr. 965). Plaintiff was referred to therapy to decrease her symptoms of depression, anxiety, and panic attacks, and she was referred to

12

psychiatry for medication evaluation and to reduce or stabilize signs and symptoms of mental illness. (Tr. 966).

On October 14, 2013, plaintiff saw Carlos Cheng, M.D., for an initial psychiatric assessment at Access Counseling. (Tr. 977-980). On mental status exam, plaintiff's memory was intact; her mood was mildly anxious and depressed; her affect was mildly constricted with cathartic tearfulness; and her thought content was appropriate with mild to reactive ruminations. (Tr. 978). Diagnosis was adjustment disorder with mixed anxiety and depressed mood, and rule out depression NOS. (Tr. 980).

Plaintiff first saw Rachel Cash, M.D., at Access Counseling Services on December 11, 2013 on transfer from another psychiatrist. Plaintiff reported a depressed mood, some anhedonia, insomnia (due to shoulder pain/chronic cough), decreased energy, decreased focus since the CVA, decreased appetite (due to the side effects of medication), and feelings of guilt/worthlessness. She denied suicidal or homicidal intention. She reported experiencing anxiety, excessive worry, insomnia/ruminating thoughts, irritability, restlessness, being on edge, and poor focus. She also reported symptoms of panic, including a "racing heart" and a dislike of large crowds. On mental status examination, Dr. Cash found that plaintiff's appearance was normal and she was well-groomed. Plaintiff appeared older than her stated age. Her mood was anxious and depressed and her affect was congruent, dysphoric, constricted, and non-labile. Plaintiff exhibited intact memory, normal speech, and good insight and judgment. Dr. Cash assessed adjustment disorder with mixed depression and anxiety; depressive disorder, not otherwise specified; and rule out depressive and anxiety disorder due to CVA. Dr. Cash adjusted plaintiff's psychotropic medication. (Tr. 984-85).

13

Plaintiff was seen on January 29, 2014 for a follow-up appointment with Dr. Cash. Plaintiff reported her moods were "off and on." (Tr. 986). She was still having some difficulty with crowds and with delayed cognitive processing and word finding abilities. (*Id.*). On mental status exam, plaintiff was alert and oriented x3; she was well-groomed and appeared older than her stated age; she was able to attend and concentrate; and she was pleasant and cooperative. Plaintiff's speech was normal and clear; her memory was intact; and her mood was better. She had a mood congruent affect, euthymic to mildly dysphoric. Her thought content and perceptions were appropriate and she denied suicidal or homicidal ideation. (*Id.*). Dr. Cash increased Zoloft and continued Klonopin for plaintiff's anxiety. (Tr. 987).

When seen on February 26, 2014, plaintiff reported having "good days and bad days." (Tr. 988). She stated that the increase in Zoloft was okay for about two weeks but then she started having more headaches. She noted a decrease in anhedonia but she was still having anxiety. Plaintiff reported experiencing a panic attack in anticipation of returning to physical therapy. Plaintiff also reported seeing her neurologist and having an EEG. The EEG showed no seizure focus and plaintiff was to be taken off of seizure medication by end of April. Plaintiff reported that her neurologist may start her on Alzheimer medication for her memory problems. (Tr. 988). Dr. Cash found plaintiff was alert and oriented and her mood was better. She had appropriate thought content, logical thought process, normal speech, intact memory, and good insight and judgment. Her medications were continued. (Tr. 989).

When seen on March 26, 2014, plaintiff reported that she "has been real edgy this month." (Tr. 990). She reported feeling tired and sleeping more. Plaintiff was still having difficulty with crowds. Plaintiff reported having cooked dinner for the first time since her

accident (in December 2012) and "it took much longer than usual" and she "noted counting every cut of vegetables." (Tr. 990). On mental status examination, plaintiff's mood was found to be "on edge." (Tr. 990). Her affect was mood congruent, mildly dysphoric, constricted, and non-labile. (*Id.*). Dr. Cash assessed adjustment disorder with anxiety and depression; depressive disorder, not otherwise specified; and rule out depression and anxiety due to CVA. (Tr. 991). Dr. Cash increased Zoloft and continued Klonopin. (*Id.*).

In April 2014, plaintiff reported she was "doing ok." (Tr. 998). She had been recently diagnosed with fibromyalgia and prescribed Cymbalta. Plaintiff noted "that it depends on the day as far as her depression. She note[d] her family had a gathering for Easter and it drained her for the next two days." (*Id.*). Plaintiff had not been sleeping very well and believed that was due in part to her pain. She reported having headaches off and on. (*Id.*). On mental status exam, plaintiff was alert and oriented x3; she was well-groomed and appeared to be her stated age; she was able to attend and concentrate; and she was pleasant and cooperative. Her speech was normal; her memory was intact; and her mood was "ok." (Tr. 998). Her affect was mood congruent, mildly dysphoric, full range, and non-labile. (*Id.*). Her thought content and perceptions were appropriate and her thought process was coherent, linear and goal directed. Her insight and judgment were good. (*Id.*). Dr. Cash assessed adjustment disorder with anxiety and depression; depressive disorder, not otherwise specified; and rule out depression and anxiety due to CVA. (Tr. 998-99). Plaintiff's medications were continued. (Tr. 999).

On June 9, 2014, Dr. Cash, opined that plaintiff was seriously limited or unable to meet competitive standards in numerous mental abilities and aptitudes needed to do even unskilled

work. (Tr. 1126-27). She also opined that plaintiff had marked difficulties in maintaining social functioning and maintaining concentration, persistence or pace. (Tr. 1127). She estimated plaintiff would miss more than four days of work per month as a result of her impairments or treatment. Dr. Cash concluded that plaintiff becomes easily overwhelmed and exhibits anxiety when faced with changes or increased stress. She has poor memory and difficulty getting through simple instructions. (Tr. 1129).

Plaintiff next saw Dr. Cash on June 11, 2014. Plaintiff reported "she has been exhausted and is not really doing anything to make her this way." (Tr. 1264). She slept a lot but it was not restful because of pain. Plaintiff noted that her moods "feel ok, but she is not really sure because she feels so tired." (*Id.*). She noted that it is about "50/50 when she will be in a good mood and a bad mood." (*Id.*). Plaintiff stated "[s]he still has the 'hung over' feeling after she engages with others for an extended period of time. She still gets panicked when her husband is out of sight." (*Id.*). On mental status exam, plaintiff's mood was "50/50"; her affect was mood congruent, mildly dysphoric, constricted, and non-labile. (*Id.*). Her thought content and perceptions were appropriate and her thought process was coherent, linear, and logical. (*Id.*). Plaintiff's medications were continued. (Tr. 1265).

On September 25, 2014, plaintiff reported that she had five migraines over the past three weeks and daily headaches, noting that the headaches were how her CVA started. She also reported that her anxiety had increased over the last two to three weeks. Plaintiff noted that she started to have panic attacks when her husband leaves the house. (Tr. 1254). On examination, plaintiff's mood was anxious and her affect was "mood congruent nervous constricted range non-

labile." (*Id.*). Dr. Cash increased Klonopin to address plaintiff's increased anxiety and continued her on Zoloft. (Tr. 1255).

An adult diagnostic update from Access Counseling dated October 3, 2014 indicated plaintiff suffered from panic attacks and felt safest in her home. (Tr. 1246-1249). She complained of constant fatigue due to depression and fibromyalgia. The update stated that when plaintiff did leave her home, her husband was close by and her source of comfort. (Tr. 1247). The update stated plaintiff's fibromyalgia was severe and kept her from engaging fully in daily activities. (*Id.*).

In November 2014, plaintiff reported she "continues to feel exhausted" and three weeks ago "[s]he had a panic attack that took 45 minutes to get out of." (Tr. 1235). She noted that the Cymbalta she took for fibromyalgia was discontinued and her headaches resolved. (*Id.*). On mental status exam, plaintiff's memory was intact, her mood was "ok," and her affect was "mood congruent mildly dysphoric access to full range non-labile." (*Id.*). Dr. Cash increased plaintiff's dose of Zoloft and continued Klonopin 1 mg two times a day plus ½ to 1 daily as needed for anxiety and panic attacks. (Tr. 1236).

On January 14, 2015, plaintiff reported no change with the increase in Zoloft. She stated she was having a lot of difficulty with her fibromyalgia and sleeping off and on at night. She was still feeling exhausted. Plaintiff noted she was taking the extra Klonopin about three times per week. She had a panic attack before she left the house that day and took a Klonopin. On exam, plaintiff's mood was anxious and depressed. Her affect was "mood congruent dysphoric constricted range non-labile." (Tr. 1223).

### E. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ failed to accord the appropriate weight to the opinions of her treating psychiatrist Rachel Cash, M.D., and treating physician Anubhav Mital, M.D.; (2) the ALJ erred by giving inadequate consideration to plaintiff's credibility and subjective complaints; and (3) the ALJ erred by relying on an improper hypothetical to the VE. (Doc. 11).

#### 1. Weight to the opinion of Dr. Cash

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20

C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ

declines to give a treating source's opinion controlling weight, the ALJ must balance the factors

set forth in 20 C.F.R. § 404.1527(c)(2)-(6) in determining what weight to give the opinion. *See*

*Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and

extent of the treatment relationship and the frequency of examination. 20 C.F.R. §

404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical

specialty of the source, how well-supported by evidence the opinion is, how consistent the

opinion is with the record as a whole, and other factors which tend to support or contradict the

opinion. 20 C.F.R. § 404.1527(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always

give good reasons in [the] notice of determination or decision for the weight [given a] treating

source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544

(ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion).

Those reasons must be "supported by the evidence in the case record, and must be sufficiently

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating

source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (citing SSR

96-2p, 1996 WL 374188 at *5 (1996)). This procedural requirement "ensures that the ALJ

applies the treating physician rule and permits meaningful review of the ALJ's application of the

rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

The ALJ gave little weight to the June 9, 2014 opinion of Dr. Cash, in which she assessed

that plaintiff: was seriously limited and unable to meet competitive standards in multiple areas;

had marked limitations in social functioning and concentration, persistence or pace; had one or

two episodes of decompensation; and would be absent more than four days per month due to her impairments. (Tr. 23-24). The ALJ found that Dr. Cash's opinion was "inconsistent with the record evidence" and "her own treatment notes." (Tr. 24). The ALJ cited to the report of consultative psychologist James Rosenthal, Psy. D., who observed that plaintiff was appropriately dressed, alert, oriented, and had good eye contact; she was polite, cooperative, answered all the questions, did not have any language disturbance, and had average speech; and she had no thought disorder and adequate knowledge, insight, and judgment. (Tr. 24, citing Tr. 575-576). The ALJ also cited to the October 13, 2013 mental status exam of Licensed Social Worker Monica Dushane from Access Counseling Services that plaintiff "had logical thought process, clear speech, average eye contact, she was well groomed, and had full affect." (Tr. 24, citing Tr. 970-972). The ALJ stated that Dr. Cash noted on January 14, 2015, that plaintiff "was anxious, but was alert, oriented, well groomed, had normal speech, appropriate thought content and process, and good insight and judgment." (Tr. 24, citing Tr. 1223). The ALJ cited to Dr. Cash's February 26, 2014 treatment note reflecting that plaintiff "was alert, oriented, had appropriate thought content, logical thought process, normal speech, intact memory, normal speech, and good insight and judgment." (Tr. 24, citing Tr. 988). The ALJ also noted that plaintiff maintained sufficient attention and concentration at the hearing to answer questions appropriately. (Tr. 24). Finally, the ALJ determined that plaintiff had no episodes of decompensation of extended duration because plaintiff had never had inpatient hospitalizations or emergency room visits indicative of decompensation episodes. (*Id.*).

Plaintiff contends the ALJ improperly weighed Dr. Cash's opinion because the ALJ failed to consider whether Dr. Cash's opinion was entitled to controlling weight; failed to consider the

regulatory factors in determining the weight to afford Dr. Cash's opinion; and failed to give "good reasons" for rejecting Dr. Cash's opinion. The Commissioner contends that the ALJ was not required to set forth any specific "controlling weight" analysis in assessing Dr. Cash's opinion and the ALJ nonetheless provided good reasons for according only little weight to the opinions of the treating physician. The Commissioner contends the ALJ was not required to provide an exhaustive factor-by-factor analysis and the ALJ's citations to examples of the inconsistencies in the record were sufficient in assessing Dr. Cash's opinion. The Commissioner argues the ALJ was duty bound to resolve the inconsistencies in the record and did so in this case.

The ALJ's decision to give little weight to Dr. Cash's opinion is without substantial support in the record. As an initial matter, and contrary to the Commissioner's contention, nothing in the ALJ's decision reflects any analysis of the treating physician rule that governs decision-making in the Sixth Circuit. Under the treating physician rule, the ALJ is to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *Blakley*, 581 F.3d at 406. An ALJ must give the opinion of a treating source controlling weight if she finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson*, 378 F.3d at 544. Even where a treating physician's opinion is not entitled to controlling weight, the ALJ must still weigh the treating source's opinion on the nature and severity of a claimant's impairments by considering several regulatory factors, including "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the

21

opinion with the record as a whole, and the specialization of the treating source . . . ." *Id.*

There is nothing in the ALJ's written decision acknowledging that Dr. Cash is plaintiff's treating psychiatrist. Moreover, there is no indication from the ALJ's decision that she applied the regulatory factors set forth in 20 C.F.R. § 404.1527(c)(2) in determining the weight to afford Dr. Cash's opinion, including the length, frequency, nature, and extent of the treatment relationship. *Blakely*, 581 F.3d at 406. Unlike Dr. Rosenthal who examined plaintiff only once, Dr. Cash had a long-standing treating relationship with plaintiff and examined her frequently. *See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii); *Wilson*, 378 F.3d at 544. Dr. Cash is a specialist in psychiatry and treated plaintiff for over one year. As a result, Dr. Cash was in the best position to evaluate plaintiff's functioning over time. The Social Security regulations recognize the need for longitudinal evidence in the case of mental impairments and that a claimant's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(2). The ALJ relied on the one-time consultative examination of Dr. Rosenthal, which occurred prior to plaintiff receiving consistent and long-term treatment at Access Counseling. The ALJ's reliance on Dr. Rosenthal's one-time exam does not account for the variations in plaintiff's functioning over time and was not a good reason for rejecting Dr. Cash's opinion. *See Gayheart*, 710 F.3d at 377 ("Surely the conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.").

While the ALJ did consider the regulatory factor of consistency, the ALJ selectively cited to portions of the medical record to discredit Dr. Cash's opinion instead of performing a proper analysis of the medical evidence under agency regulations and controlling case law. *See Germany-Johnson v. Commissioner of Social Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (noting the ALJ "was selective in parsing the various medical reports"); *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011) (noting ALJ's conclusion was "grounded in a myopic reading of the record combined with a flawed view of mental illness"). The ALJ cited to only a portion of the October 2013 mental status exam from Access Counseling showing plaintiff "had logical thought process, clear speech, average eye contact, she was well groomed, and had full affect." (Tr. 24, citing Tr. 970-972). The ALJ, however, omitted findings from that same exam which support Dr. Cash's assessment: plaintiff's activity was "slowed," her demeanor and behavior were "withdrawn," and her mood was "depressed" and "anxious." (Tr. 970-71). In addition, the ALJ cited to only two of Dr. Cash's treatment notes, failed to identify the findings in the Access Counseling notes that supported Dr. Cash's opinion, and failed to view those findings in the context of plaintiff's entire mental health treatment record. Since the level of functioning at any specific time may seem relatively adequate or, conversely, rather poor, proper evaluation of plaintiff's mental impairments must take into account variations in levels of functioning in determining the severity of her impairments over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(2). The ALJ cited to Dr. Cash's February 26, 2014 treatment note showing relatively stable findings, but she failed to note that during the following month's visit Dr. Cash observed plaintiff's mood was "on edge" and her affect was mood congruent, mildly dysphoric, and constricted. (Tr. 990). At that same visit, Dr. Cash increased plaintiff's dosage of Zoloft and

continued Klonopin. (Tr. 991). Likewise, when citing Dr. Cash's January 2015 treatment note, the ALJ failed to note Dr. Cash's finding of depressed mood with congruent and dysphoric affect and constricted range and that Dr. Cash recommended Buspar (an anti-anxiety agent) as an adjunct medicine. Dr. Cash treated plaintiff on a monthly basis and consistently adjusted plaintiff's medications throughout the relevant time period to address plaintiff's ongoing and fluctuating anxiety and depression. At each visit, Dr. Cash noted that plaintiff continued to receive mental health counseling at Access Counseling, Dr. Cash's practice, which plaintiff received on a regular and consistent basis. It does not appear that the ALJ considered whether Dr. Cash's opinion was consistent with the other Access Counseling notes to which she had access. (*See* Tr. 1007, mood/affect anxious-10/24/13; Tr. 1010, no significant change from last visit-11/11/13; Tr. 1013-14, "super" depressed and anxious mood/affect, psychomotor retardation-12/11/13; Tr. 1017, no significant change from last visit, continues to experience anxiety and panic attacks once every other day and is isolating, score on Burns Anxiety Inventory indicated "severe anxiety"-1/29/14; Tr. 1020, no significant change from last visit, continues to experience panic attacks one to two times per week, feels "edgy" daily-2/26/14; Tr. 1023, mood/affect "edgy" feels like could "pop off," Burns Anxiety and Depression Inventories indicate "extreme anxiety or panic" and "severe depression"-3/26/14; Tr. 1026, no significant change from last visit-4/9/14; Tr. 1029, mood/affect anxious and hopeful, concrete thinking, focused thought process, open and engaging behavior, trouble sleeping at night and taking frequent naps-4/30/14; Tr. 1267, no significant change from last visit-5/14/14; Tr. 1261, no significant change from last visit-6/11/14; Tr. 1250, no significant change from last visit, experiencing panic attacks when husband goes out-9/26/14; Tr. 1243, no significant change from

last visit, doctor increased Klonopin due to panic attacks-10/08/14; Tr. 1240, no significant change from last visit-10/22/14; Tr. 1238, no significant change from last visit, had severe panic attack for 45 minutes while taking shower, not able to breathe, rapid heart rate, fear -11/5/14; Tr. 1232, no significant change from last visit, increased fatigue, continues with panic attacks whenever husband leaves the house-11/19/14; Tr. 1225, no significant change from last visit, very tired most days, Zoloft increased but does not feel positive effects-12/17/14; Tr. 1220, no significant change from last visit, had panic attack before therapy session-1/14/15). These counseling sessions are not inconsistent with Dr. Cash's findings and reflect the long-standing nature of plaintiff's anxiety and depression. Dr. Cash was well-aware that plaintiff was being seen by mental health counselors at Access Counseling and the ALJ should have considered the totality of the therapy notes in weighing Dr. Cash's opinion.

Finally, the ALJ cited to plaintiff's ability to concentrate at the ALJ hearing and answer questions appropriately to support giving little weight to the treating psychiatrist's opinion. (Tr. 24). However, there is no evidence that the ability to attend and concentrate at a 48 minute ALJ hearing equates to the ability to sustain attention and concentration on a regular and continuing basis for purposes of substantial gainful activity. *See* Social Security Ruling 96-8p ("A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."). This was not a "good reason" for discounting the treating psychiatrist's opinion.

Rather than relying on the opinion of the treating psychiatrist, the ALJ gave "significant weight" to the assessments of the non-examining state agency psychologists, Frank Orosz, Ph.D., and Carl Tishler, Ph.D. In July 2013, Dr. Orosz found that plaintiff was mildly restricted in her in

activities of daily living and in social functioning; was moderately restricted in concentration, persistence, or pace; and had no episodes of decompensation. (Tr. 79). Dr. Orosz concluded that plaintiff could perform a variety of tasks in a stable, static work environment with limited fast-paced production standards. (Tr. 84). Dr. Tishler reviewed plaintiff's record in January 2014 and affirmed Dr. Orosz's assessment. (Tr. 96). However, the state agency doctors did not have *any* of the records from Access Counseling when they rendered their opinions, including Dr. Cash's medical assessment of plaintiff's functioning. (See Tr. 74-77, 90-94). One factor the ALJ must consider in weighing medical opinions is "the extent to which an acceptable medical source is familiar with the other information in [the] case record." 20 C.F.R. § 404.1527(c)(6). A state agency reviewing doctor's opinion may be entitled to greater weight than that of a treating or examining doctor in certain circumstances, such as when the "State agency medical . . . consultant's opinion is based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source." *Blakley*, 581 F.3d at 409 (quoting SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). However, where a non-examining source has not reviewed a significant portion of the record and the ALJ fails to indicate that she has "at least considered [that] fact before giving greater weight" to the reviewing doctor's opinion, the ALJ's decision cannot stand. *Blakley*, 581 F.3d at 409 (internal quotation omitted).

In this case, the later-generated treatment notes and opinions by the Access Counseling providers contain a more detailed picture of plaintiff's functionality than the evidence before the state agency reviewing psychologists and indicate a more restrictive level of functioning that was not considered by those psychologists. The state agency psychologists did not review this

evidence prior to proffering their opinions, making their opinions incomplete. For these reasons, the ALJ erred in giving "significant weight" to the opinions of the non-reviewing state agency psychologists without giving any indication she considered the significant amount of evidence discussed above that was not in the record at the time of their reviews. *Blakley*, 581 F.3d at 409.

The Court concludes that the ALJ failed to apply the controlling regulatory and case authority when considering the weight to accord the treating psychiatrist's opinion. In addition, the ALJ failed to articulate "good reasons" for giving only little weight to the treating psychiatrist's opinion in this case. *Wilson*, 378 F.3d at 544. The ALJ's decision in these respects constitutes legal error warranting a reversal of this case. *Id*. at 546.

### 2. Weight to the opinion of Dr. Mital

The ALJ gave only "little" weight to the opinion of Dr. Mital, which assessed plaintiff as incapable of even sedentary work activity. (Tr. 24). The ALJ found that Dr. Mital's restrictions were "inconsistent and not supported by the record evidence." (*Id.*). The ALJ relied on findings of normal range of motion in all major joints, no tenderness upon palpation, and normal sensation that were noted by an emergency room physician in September 2013. (Tr. 24, citing Tr. 726). The ALJ also relied on two of Dr. Mital's progress notes, showing no distress, no edema, normal sensation, and no sensory deficits. (Tr. 24, citing 1270-71 and 1292-93). Based on these three records, the ALJ concluded that Dr. Mital's opinion was "inconsistent with the totality of the record evidence. . . ." (Tr. 24).

Plaintiff contends the ALJ improperly weighed Dr. Mital's opinion because the ALJ failed to consider whether Dr. Mital's opinion was entitled to controlling weight; the ALJ failed to consider the regulatory factors in weighing Dr. Mital's opinion; and the ALJ failed to give

"good reasons" for rejecting Dr. Mital's opinion. Plaintiff contends that while her medical file contains over 1,000 pages of medical records, the ALJ improperly relied upon only two of Dr. Mital's notes and one emergency department note in weighing Dr. Mital's opinion. The Commissioner argues the ALJ discussed the other medical evidence of record throughout her decision and was permitted to give representative examples of such evidence in weighing Dr. Mital's opinion.

As with Dr. Cash, the ALJ's written decision fails to demonstrate she applied the treating physician rule in weighing Dr. Mital's opinion. The ALJ did not qualify Dr. Mital as a treating source and she did not address the regulatory factors in weighing Dr. Mital's opinion.

Additionally, the three notes identified above that the ALJ relied on are not representative of the "totality of the record evidence," particularly with regard to plaintiff's fibromyalgia, which Dr. Mital listed as one of plaintiff's many diagnoses and which the ALJ found to be a severe impairment. As Dr. Mital noted, plaintiff was treated by a rheumatology specialist for her fibromyalgia. (Tr. 1284, 1294). Dr. Badreddine, plaintiff's treating rheumatologist, found fibromyalgia tender points were all positive on three separate examinations and that plaintiff reported having constant muscle pain, fatigue, sleep disturbances, and stiffness. (Tr. 1175-1177; 1172; 1170). Dr. Badreddine also found range of motion of the right shoulder was limited and neck range of motion elicited pain. (Tr. 1172, 1170). She further found no swelling in any of plaintiff's joints or synovitis. (Tr. 1170, 1175, 1176). Dr. Badreddine ordered a complete laboratory workup and stated that if the lab work was negative, she would treat plaintiff for fibromyalgia. (Tr. 1177). Plaintiff's lab work was negative and Dr. Badreddine assessed fibromyalgia and fatigue, significant in nature. (Tr. 1172).

28

The Sixth Circuit has explained that fibromyalgia "causes severe musculoskeletal pain which is accompanied by stiffness and fatigue due to sleep disturbances." *Preston v. Sec'y of HHS*, 854 F.2d 815, 817 (6th Cir. 1988). Social Security Ruling (SSR) 12-2p, which provides guidance on how the agency both develops "evidence to establish that a person has a medically determinable impairment of fibromyalgia" and evaluates fibromyalgia in disability claims, describes fibromyalgia as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12–2p, 2012 WL 3017612 (July 25, 2012). "[D]isability claims related to fibromyalgia are related to the *symptoms* associated with the condition—including complaints of pain, stiffness, fatigue, and inability to concentrate—rather than the underlying condition itself." *Kalmbach v. Commissioner of Social Security*, 409 F. App'x 852, 862 (6th Cir. 2011) (emphasis in original) (citing *Rogers v. Comm'r,* 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929). *See also* SSR 12-2p (listing among the diagnostic criteria for fibromyalgia a history of widespread pain and other symptoms including manifestations of fatigue, waking unrefreshed, anxiety disorder, and irritable bowel syndrome).

The Sixth Circuit has recognized that fibromyalgia is not amenable to objective diagnosis and standard clinical tests are "not highly relevant in diagnosing [fibromyalgia] or its severity." *Preston*, 854 F.2d at 820. The Court in *Preston* explained: "In stark contrast to the unremitting pain of which fibrositis [now termed "fibromyalgia"] patients complain, physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion and testing of certain 'focal

29

tender points' on the body for acute tenderness which is characteristic in [fibromyalgia] patients."

*Id*. at 817-18. Other courts have likewise recognized that fibromyalgia can be disabling even in

the absence of objectively measurable signs and symptoms. *See Reardon v. Prudential Ins. Co.*

*of America,* No. 1:05cv178, 2007 WL 894475, *14 (S.D. Ohio March 21, 2007) (citing *Green–*

*Younger v. Barnhart,* 335 F.3d 99, 108 (2d Cir. 2003) (fibromyalgia is a "disabling impairment"

that can qualify an individual for disability payments even though "there are no objective tests

which can conclusively confirm the disease"); *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.

1996) ("[Fibromyalgia's] cause or causes are unknown, there is no cure, and, of greatest

importance to disability law, its symptoms are entirely subjective. There are no laboratory tests

for the presence or severity of fibromyalgia."); *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp.2d

986, 990 (N.D. Ohio 2003) (since the presence and severity of fibromyalgia cannot be confirmed

by diagnostic testing, the treating physician's opinion must necessarily depend upon an

assessment of the patient's subjective complaints).

The ALJ failed to properly consider plaintiff's fibromyalgia impairment in weighing Dr.

Mital's functional capacity assessment. It is undisputed that plaintiff suffers from the severe

impairment of fibromyalgia. (Tr. 14, 19). Once the ALJ made this factual finding, it was

incumbent upon the ALJ to apply the correct legal standard for evaluating plaintiff's limitations

from fibromyalgia and, by extension, Dr. Mital's functional capacity assessment. By focusing on

the lack of objective medical data in assessing the weight to Dr. Mital's opinion the ALJ failed to

evaluate plaintiff's fibromyalgia in accordance with Sixth Circuit precedent. The ALJ's decision

in this regard is not supported by substantial evidence and this matter should be remanded for

reevaluation of plaintiff's fibromyalgia impairment and the weight to be given to Dr. Mital's opinion.

### 3. The Court need not reach plaintiff's assignment of error concerning the ALJ's assessment of her credibility, subjective complaints, and pain.

It is not necessary to address plaintiff's argument that the ALJ improperly assessed her credibility, subjective complaints, and pain because on remand the ALJ's reconsideration of the medical and opinion evidence in this matter and plaintiff's RFC may impact the remainder of the sequential evaluation process, including the ALJ's assessment of plaintiff's credibility. *See Trent v. Astrue,* No. 1:09-cv-2680, 2011 WL 841538, at *7 (N.D. Ohio Mar. 8, 2011). In any event, even if this assignment of error had merit, the result would be the same, i.e., remand for further proceedings and not outright reversal for benefits. *See Mays v. Comm'r of Soc. Sec.,* No. 1:14-cv-647, 2015 WL 4755203, at *13 (S.D. Ohio Aug. 11, 2015) (Report and Recommendation) (Litkovitz, M.J.), *adopted,* 2015 WL 5162479 (S.D. Ohio Sept. 3, 2015) (Dlott, J.).

### 4. Whether the ALJ presented improper hypotheticals to the VE.

As discussed above, substantial evidence does not support the ALJ's rejection of the opinions of plaintiff's treating physicians and, by extension, the ALJ's RFC assessment. Consequently, the hypothetical questions presented to the VE do not properly reflect plaintiff's impairments and/or limitations. Accordingly, the ALJ erred by relying on this vocational testimony to carry her burden at step five of the sequential evaluation process. *See White v. Comm'r of Soc. Sec.,* 312 F. App'x 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated RFC that did not accurately portray claimant's impairments). Because the ALJ's hypothetical questions failed to accurately portray plaintiff's impairments and limitations, the VE's testimony in response to those hypothetical does not

constitute substantial evidence that plaintiff could perform the work identified by the VE. Therefore, plaintiff's assignment of error should be sustained and this matter should be reversed and remanded with instructions to the ALJ to provide a hypothetical question to the VE that accurately portrays plaintiff's limitations as determined by the ALJ after giving proper weight to the opinion evidence and formulating a consistent RFC.

## III. This matter should be reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of her alleged onset date. *Faucher v. Sec'y of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). This matter should be reversed and remanded for further proceedings with instructions to the ALJ to re-weigh the medical opinion evidence in accordance with this decision; to reassess plaintiff's RFC, giving appropriate weight to the opinions of Drs. Cash and Mital, including consideration of plaintiff's fibromyalgia in accordance with Sixth Circuit case law; to reassess plaintiff's credibility; and for further medical and vocational development.

**IT IS THEREFORE RECOMMENDED THAT:**

The decision of the Commissioner be **REVERSED** and **REMANDED** for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _8/15/17_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

BECKY BOSTICK,
    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:16-cv-849
Black, J.
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).